# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA
# FRESNO DIVISION

| | |
|---|---|
| KENNETH L. HOWARD,<br>CDCR #K-87090,<br><br>         Plaintiff,<br><br>vs.<br><br>A. HEDGPETH, *et al.*,<br><br>         Defendants. | Civil No.   08cv00859-RTB(PCL)<br><br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT<br><br>(Dkt. No. 53) |

Plaintiff Kenneth L. Howard, a state prisoner proceeding *pro se* and *in forma pauperis* with a Second Amended Complaint pursuant to 42 U.S.C. §1983, alleges that Defendants compelled him to work in unsafe conditions at Kern Valley State Prison (KVSP), in violation of his Eighth and Fourteenth Amendment rights, resulting in his injury. (Dkt. No. 11; *see* Dkt. No. 18; *see also* Dkt. No. 64, pp. 6-7.) The incident occurred on October 29, 2007, while Howard was a sanitation worker assigned to the prison kitchen. He alleges a piece of loose metal on the door casing to the walk-in vegetable freezer severely cut his left hand while he was helping to move a pallet of vegetables, as instructed by a duty officer. He names as defendants the prison warden and five correctional officers and seeks compensatory damages, punitive damages, and a declaratory judgment.[1]

By Order entered November 25, 2008, this matter was reassigned for all purposes to the undersigned visiting judge. (Dkt. No. 7.) Defendants now move for summary judgment on grounds that

---

[1] The docket reflects a Summons issued for an additional defendant, A. Rogers, identified in the SAC as the Chief Food Manager at KVSP. (Dkt. No. 11-1, p. 5, ¶¶ 13-15.) That Summons was returned unexecuted in November 2009 (Dkt. No. 21), and he has not appeared in this action.

the undisputed facts reveal no triable issue of fact to support Howard's civil rights claims. (Dkt. No. 53, 6:9-12.) The Court provided Howard with the required Klingele/Rand notice and set a briefing schedule. (Dkt. No. 55.) Howard filed an Opposition (Dkt Nos. 58-65) and Defendants filed a Reply (Dkt. No. 67). After careful consideration of the parties' briefing and exhibits in light of controlling legal authority, the Court finds that Howard fails to substantiate a genuine issue of material fact, and Defendants are entitled to judgment in their favor as a matter of law, for the reasons discussed below. The Court therefore **GRANTS** the Motion.

I.   BACKGROUND

Howard alleges in his verified SAC that each of the named defendants knew of loose metal on the vegetable freezer door jamb in the KVSP central kitchen that he contends created a hazardous condition. He alleges Defendants had a duty to provide a safe working environment in the kitchen facility, yet none acted to repair, illuminate, or otherwise alert workers to that hazard. The loose metal "was so dangerous it ultimately became a knife like object ripping through [Howard's] left hand causing severe damage" while he was helping another inmate move a vegetable pallet across the freezer threshold, causing him "to suffer and endure unnecessary pain, wanton infliction of great bodily injury," purportedly with "Deliberate Indifference to [his] health & safety under Eighth Amendment cruel and unusual punishment clause." (Dkt. No. 11-1, SAC pp. 5-6.) Howard characterizes the hazardous condition as "well beyond contemporary standards of decency and therefore violate[d] the Eight[h] and Fourteenth Amendment[s]." (Dkt. No. 64, 13:14-18.)

> On 10/29/07, 1:20 p.m. (PLAINTIFF) a prisoner / (KVSP) central kitchen worker was instructed by Supervisor M&SSI M. Hankins to help move fully loaded pallets of vegetable into the VEG. FREEZER (over plaintiff objection).[2] To refuse would be considered refus[]ing a direct order subject to (RVR / 115) RULES VIOLATION REPORT. Plaintiff done as instructed even though the VEG. FREEZER lacked a bright light to

---

[2] Howard's "objection" to helping with the vegetable pallets was unrelated to any hazardous working condition. At his Deposition, he described the manner in which he and inmate Washington came to assist in the freezer. Howard's kitchen assignment at the time was to clean food carts and empty trash and the like, as a "sanitation worker." (Dkt. No. 53-1, 7:6-12.) The scope of his duties did not include entering or cleaning the walk-in refrigerators and freezers. (Id., 7:13-25 ("Well, it would be outside of my area, but if a staff asked you, you must do it").) He had finished in his assigned job and was sitting down laughing and talking with Mr. Washington. "Mr. Hankins only had one of his workers in, when he normally has four to five. . . . So he seen us over there joking and playing. And they had a lot of work, a lot of pallets, a lot of vegetables, so he asked me and Washington to come and help him move them in the freezer, and we complied." (Id., 9:16-25.)

> help (PLAINTIFF) see or avoid any defect and as a result was deprived of his right to a safe work environment. Plaintiff begun pushing the fully loaded pallet of vegetables from the back when out of no where a piece of metal ripped through (PLAINTIFF) left hand causing severe damage.

(Dkt. No. 11-1, pp. 3-4.)

Howard's Opposition explains that "Plaintiff was pushing loaded pallet of vegetable[s] from the back when the loose metal on the VEG. FREEZER door jam got caught on pallet and once released the loose metal rubber band right into Plaintiff's L-hand causing severe damage as the inadequate lighting in the VEG. FREEZER prevented Plaintiff to foresee said injury coming." (Dkt. No. 64, 9:23-10:7.) He alleges Defendants were aware of the loose metal "7-months prior to Plaintiff's injury." (Id.) At his Deposition, Howard elaborated that he and inmate Washington were using a jack and pushing the vegetable pallet out of the freezer to make room inside for more supplies. (Dkt. No. 53-1, 13:18.) Howard was pushing the pallet from behind. Inmate Washington exited the freezer first, guiding the "hydro part" which "controls the direction the pallet jack goes" on two large castors. (Id., 13:7-9, 24-25, 14:2-7.)

> Well, I was pushing it out. I believe the pallet got stuck on the loose metal upon the door frame. And once I pushed the pallet past the door frame, the loose metal then rubber band[ed] right into my hand.

(Dkt. No. 53-1, 15:15-18, 21:11-20.)

Howard confirmed at his Deposition the loose portion of the metal "never broke off," but rather "stayed in its original detachment which it was prior" as part of the one-piece metal casing around the entire door frame. (Dkt. No. 53-1, 19:13-20:12.) He described the damaged casing as twelve inches or less up from the floor, on only one side, with all the rest around the sides and top "attached." (Id., 33:18-25, 34:17-24.) Officials ultimately removed "the whole door frame" in response to his administrative appeals seeking repair of the door and $100,000 in damages. (Id., 35:13-14.)

Howard alleges his hand bled profusely. Defendant Hankins, the Materials and Stores Supervisor who had asked him to help move the vegetable pallets, told him to notify other officers. (Dkt. No. 11-1, p. 4, ¶ 3.) Howard had to "run around" the central kitchen "scared out of his wits looking for help." (Id.) He went to the back dock of the kitchen, saw defendants Sergeant W. Kirby and CO Semple, and approached them, screaming that he needed help. (Id., p. 4, ¶ 4.) They were both "in AWE at the open

wounds" on his hand and asked how the injury happened. He told them that the loose metal on the vegetable freezer had ripped his hand open and that defendant Hankins had witnessed the whole incident. (Id., p. 4, ¶ 4-5.)

> At that time, [Howard] was immediately sent to B-yard facility medical department which had [him] escorted to (CTC) central treatment center. After temporary treatment to control bleeding [he was] in much pain [and] had to await DOCTOR's orders which refe[r]red [him] to outside HOSPITAL (DRMC) DELANO REGIONAL MEDICAL CENTER. . . . [¶] After 6-hours of waiting enduring much pain and suffering and a shift change at the (DRMC) HOSPITAL, Plaintiff at last was seen and treated. Plaintiff, had to have x-rays first to assure no metal remained in (L) hand. Once cleared (no metal in hand) received [*sic*] several shots, cl[ea]ning of open wounds, stitches and finally get/take pain medication. . . . [¶] Plaintiff has been under DOCTOR's care for (L) hand injury since incident on 10/29/07. Plaintiff, has suffered severe emotional distress and irreparable injuries and permanent injuries to his (L) hand, los[s] of movement & constant pain. . . .[3]

(Dkt. No. 11-1, p. 4, ¶¶ 5-8..)

Howard's theory of liability against all the named Defendants rests solely on his allegations he was made to work in unsafe conditions and was compelled to perform work that endangered his health and caused him undue pain, summarizing his Eighth Amendment claim as: "Defendant[]s placed Plaintiff in harm[']s way, then failed to protect him from known substantial risk/hazard, resulting in injury." (Dkt. No. 64, 10:7-9; *see also* Dkt. No. 11-1, p. 4, ¶ 9.) He characterizes those circumstances as objectively depriving him of humane conditions of confinement, with subjective deliberate indifference. (Id., 10:26-11:9, *citing* Farmer v. Brennan, 511 U.S. 825, 834 (1994), Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994), and Hope v. Pelzer, 536 U.S. 730, 736-38 (2002)).

Defendants move for summary judgment as a matter of law on the grounds that Howard cannot establish a constitutional violation occurred. (Dkt. No. 53, 1:23-25.) They represent: "Under the Eighth Amendment standard, Plaintiff can put forth no credible evidence to support his assertion that defendants were deliberately indifferent to the work conditions at the kitchen in Kern Valley State Prison as the undisputed facts reveal that Plaintiff's injury resulted from a freak occurrence, not from Plaintiff being compelled to work in conditions that were demonstrably unsafe." (Dkt. No. 53, 8:7-11.)

---

[3]Howard does not allege an Eighth Amendment claim on any theory associated with the response to his injury or the medical treatment he received.

## II. DISCUSSION

### A. Legal Standards

#### 1. Civil Rights Act, 42 U.S.C. § 1983

The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983 "), creates a procedure to vindicate federal rights violations. *See* Graham v. Connor, 490 U.S. 386, 393-94 (1989) ("[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred' ") (citation omitted). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). "Liability under section 1983 arises only upon a showing of personal participation by the defendant," acting under color of state law, that deprived the plaintiff of a constitutional or federal statutory right. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). There is no *respondeat superior* liability under Section 1983. Monell v. Dept of Soc. Servs, 436 U.S. 658, 691-94 (1978) (the supervisor of someone who allegedly violated a plaintiff's constitutional rights is not made liable for the violation by virtue of that role).

Federal courts hold *pro se* litigants' pleadings to "less stringent standards than formal pleadings drafted by lawyers." Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987) (punctuation and citation omitted); *see* Erickson v. Pardus, 551 U.S. 89, 93, 94 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed"). However, " 'a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled.' " Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 ( 9th Cir. 1997) (citation omitted). Furthermore, the advantage of liberal construction does not entitle *pro se* pleadings to "the benefit of every conceivable doubt," but only to the drawing of "reasonable or warranted factual inferences." McKinney v. De Bord, 507 F.2d 501, 504 (9th Cir. 1974).

#### 2. Prison Litigation Reform Act

The Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e, modified the processing of *pro se* prisoners' civil rights complaints. The court may now at any time dismiss an action

or portions of it, *sua sponte* or on a party's motion, if the "action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1983e(c); *see also* 28 U.S.C. § 1915. The PLRA also restricts the availability and extent of remedies prisoners may seek in civil rights actions. For example, recovery for mental or emotional injury suffered while in custody requires "a prior showing of physical injury" that is more than *de minimus*. 42 U.S.C. § 1997e(e); *see also* Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002); Jackson v. Carey, 353 F.3d 750, 758 (9th Cir. 2003); *cf.* Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998) (no such showing applies to allegations of constitutional violations not premised on mental or emotional injury, such as claims arising under the First Amendment).

### 3. Summary Judgment Standard Of Review

Any claiming or defending party "may move, with or without supporting affidavits, for summary judgment on all or part of the claim." FED. R. CIV. P. 56(a), (b). Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 256 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). The substantive law defining the elements of the claim controls the materiality of facts. *See* Anderson, 477 U.S. at 248. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *See* Celotex, 477 U.S. at 323.

The moving party bears the initial "burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The movant need not produce evidence negating the non-movant's claims. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885, 888-89 (1990) ("the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues"). If the moving party fails to discharge that burden,

summary judgment must be denied, "even if no opposing evidentiary matter is presented." Adickes, 398 U.S. at 159-60.

If the movant carries its burden, the burden shifts to the non-moving party to establish facts beyond the pleadings showing there remains a genuine issue of material fact so that summary judgment is not appropriate. Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to create a genuine issue for trial. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); *see* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (there is no genuine issue for trial if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion); *see also* Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) ("To avoid summary judgment, [the plaintiff] was required to present significant probative evidence tending to support her allegations") (punctuation and citations omitted). The opposing party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). The opposing party may not rest on mere assertions or conclusory allegations. *See* Taylor, 880 F.2d at 1045. Rather, that party must present evidence of specific and material factual disputes that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 249-50, 256 (citation omitted).

The court accepts the version of disputed facts most favorable to the non-moving party in ruling on a Rule 56 motion. Anderson, 477 U.S. at 255. The court does not make factual findings or credibility determinations, weigh conflicting evidence, or draw its own inferences, as those are functions reserved for the trier of fact. Id. at 249, 255, 249 (the district court's role on summary judgment is merely to determine whether there is a genuine issue for trial). Considering the evidence from both sides, "[i]f reasonable minds could differ" and there is "evidence on which the jury could reasonably find for the [non-moving] party," summary judgment for the moving party is improper. Id. at 252; *see also* Lujan, 497 U.S. at 888 ("[W]here the [material] facts specifically averred by [the opposing] party contradict facts specifically averred by the movant, the motion must be denied"). Conversely, summary judgment must be entered for the moving party "if, under the governing law, there can be but one

1  reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250-251; Celotex, 477 U.S. at 325.

### 4. Eighth Amendment In Prison Working Conditions Context

The Eighth Amendment protects prisoners from inhumane conditions of confinement as well as inhumane methods of punishment. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). The cruel and unusual punishment prohibition applies to all conditions within a prison, including work programs, medical care, housing facilities, security measures, and so forth. *See, e.g.*, Rhodes v. Chapman, 452 U.S. 337, 344-47 (1981). To be actionable, the prison officials' conduct "must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986); *see also* Estelle v. Gamble, 429 U.S. 97, 104 (1976); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991) ("It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock").

In the working conditions context, the Eighth Amendment is implicated only when a prison employee alleges that a prison official compelled him to "perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] undue pain." Morgan, 465 F.3d at 1045, *quoting* Berry v. Bunnell, 39 F.3d 1056 (9th Cir. 1994). Resolution of an Eighth Amendment claim entails inquiry into the official's state of mind. Prison officials are liable only if they were deliberately indifferent to a substantial risk of serious harm. Farmer, 511 U.S. at 837 ("the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference"); *see* Wilson, 501 U.S. at 298-99, 302-03 *(*the official must actually know of the risk yet fail to take reasonable measures to ensure the prisoner's safety); *see also* LeMaire v. Mass, 12 F.3d 1444 (9th Cir. 1993). Even "[i]f a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk." Farmer, 511 U.S. at 834. Although the defendant's conduct need not have been undertaken for the very purpose of causing harm before it violates the constitution, a "sufficiently culpable state of mind" requires that the conduct involve more than mere negligence. Id. at 837, 847 (nothing less than recklessness in the criminal sense, that is, subjective disregard of a risk of harm of which the actor is

actually aware, satisfies the "deliberate indifference" element of an Eighth Amendment claim). If the risk of harm was obvious, the trier of fact may infer that a defendant knew of the risk, but obviousness *per se* will not impart knowledge as a matter of law. Id. at 840-42.

### B.  Summary Judgement For Defendants

#### 1.  Howard's Due Process Claim

"'The first inquiry in any § 1983 suit' is 'to isolate the precise constitutional violation with which [the defendant] is charged.'" Graham v. Connor, 490 U.S. 386, 394 (1989) (citation omitted). At his deposition, Howard was asked to clarify his Fourteenth Amendment due process claim that Defendants violated his rights "because of the rules and regulations that dictate that I have to follow the instructions of staff" at KVSP. (Dkt. No. 53-1, 37:23-25.)

> A. Well, due process. Everyone is entitled to due process. I believe that's an absolute of the Constitution. And when one is compelled to work under hazardous conditions, deprived of liberty without due process, I believe that's a violation of the Fourteenth Amendment. Resulting in injuries.

(Dkt. No. 53-1, 37:12-19.)

Defendants contend Howard's due process claim "must be analyzed under the Eighth Amendment standard alone," because "where a particular provision of the Constitution 'provides an explicit source of constitutional protection' against a particular sort of government behavior,' that provision must be the guide for analyzing Plaintiff's claims.'" (Dkt. No. 53, 8:3-7, *citing* Patel v. Penman, 103 F. 3d 868, 874 (9th Cir. 1996), *quoting* Albright v. Oliver, 510 U.S. 266, 273-74 (1994).) This Court agrees. Howard's Opposition reiterates this claim in a manner emphasizing its overlap with his Eighth Amendment claim, alleging both arise from his having been compelled to work under dangerous conditions.[4] (Dkt. No. 64, 7:4-9: "Plaintiff also alleges that Defendant[]s further violated his Fourteenth Amendment (Due Process) [rights] by depriving him of 'liberty' without due process by compelling him to work under dangerous conditions, resulting in injury.") Accordingly, as Howard

---

[4] Howard couches the source of both claims in the same language: "Defendant[]s['] reckless disregard violated Plaintiff['s] protected Eight[h] and Fourteenth Amendment Constitutional rights to remain free from unnecessary wanton infliction of pain, resulting in (Deliberate Indifference) and (Due Process) violations occurring on 10/29/07, and that Defendant[]s['] failed in their Obligatory duties to Protect Plaintiff's 8th and 14th Amendment constitutional rights." (Dkt. No. 65, 2:24-3:4.)

charges Defendants with a constitutional violation arising explicitly under the Eighth Amendment for the same conduct, summary adjudication of his Fourteenth Amendment claim in Defendants' favor is **GRANTED**.

### 2.     Factual Disputes Not Material

Howard "Admits" all but five of the 20 Undisputed Facts posited by Defendants in support of their Motion. He "Denies" Defendants' Undisputed Fact Nos. 8, 12, 13, 17, and 20. The Court finds none of the facts Howard disputes suffices to create a genuine issue for trial.

Defendants' Undisputed Fact No. 8 states: "Mr. Washington exited the freezer first without incident as the castors on his end did not get stuck at the threshold of the freezer door." (Dkt. No. 53, 3:21-23.) Howard "Denies" that fact "in that the casters on Mr. Washington[']s end did not get stuck at the threshold of the freezer door," but rather, as Howard "clearly" stated at his deposition, "it had a dip in the floor, in the doorway 'threshold' which Plaintiff believed was holding it up." (Dkt. No. 62:3:26-4:3.) Irrespective of the detail Howard purports to dispute, it is undisputed that Howard encountered resistance while pushing the pallet out of the freezer. It was his impression at the time that the pallet got "stuck" due to "a dip in the floor, in the doorway, which I believe[d] was holding it up" because at that point, he "didn't know the loose . . . metal had a hold on it as well." (Dkt. No. 53-1, 18:9-16.)[5] He also testified he now "believe[s] the pallet got stuck on the loose metal upon the door frame." (Id., 15:15-16.) In the current state of the evidence, there is actually no dispute the pallet temporarily hung up on the damaged strip of metal casing along the door frame, which sprang back and cut Howard's hand when the inmates forced the pallet over the freezer threshold. (*See* Dkt. No. 53, 9:8-12.)

Howard also "Denies" Defendants' Undisputed Fact Nos. 12 and 13, going to the nature of his injury and the sharpness of the metal that caused it. (Dkt. No. 53, 4:12-20.) Defendants contend he was "not injured by any sharp piece of metal, but rather the injury was caused because the base cover sprang back into his left hand at a high rate of speed, the force of which caused a laceration." (Id., 4:12-19.)

---

[5] Howard also testified at his deposition: "Q. And once you hit that dip in the floor, did you – did you push the pallet then? A. Correct. Q. Did you tell Mr. Washington to jack the pallet up higher? A. Well, he did. He done that on his own, because we rocked back and forth a couple of times trying – it was that heavy." (Dkt. No. 53-1, 18:17-24.)

Howard apparently believes Defendants' characterization of his injury as a "laceration" minimizes its seriousness. Nine sutures were required to close the wound. The circumstances of the injury are essentially undisputed. The Court finds the disputed nuances urged by each side about the sharpness of the object that indisputably struck and cut Howard's hand are immaterial to resolution of the Motion.

Howard also "Denies" Undisputed Fact No. 20. Defendants rely on his Deposition testimony for the characterization Howard does not contend the loose metal strip was hazardous because it was sharp or jagged or that "it could conceivably cause injury by its very nature," but rather he believed it was dangerous because inmates at KVSP, a maximum security prison, could have pried off a piece to fabricate a weapon.[6] (Dkt. No. 53, 5:15-20.) While it is true Howard so testified, the Court must construe the facts in the light most favorable to the non-moving party in deciding a summary judgment motion. <u>Anderson</u>, 477 U.S. at 255. The evidentiary record before the Court contains evidence, such as the fact that repair requests were submitted twice in the months before the accident, from which a reasonable trier of fact could conclude the loose casing also posed some inherent risk of injury, even if the edge was smooth rather than jagged, and the fact that the injury was a laceration disposes of Defendants' attempted inference the sheet metal edge was not sharp.

Finally, Howard "Denies" Defendants' Undisputed Fact No. 17, representing "Plaintiff has no evidence that Warden Hedgpeth was aware of the condition of the casing/base cover at the stainless steel door entrance to the freezer prior to his injury." (Dkt. No. 53, 5:7-9, *citing* Dkt. No. 53-1, 74:5-8.) Conclusory allegations that a prison official should have been aware of an allegedly hazardous condition cannot satisfy the personal knowledge requirement for 42 U.S.C. § 1983 liability. <u>Farmer</u>, 511 U.S. at 837. As discussed below, the Court finds Howard has not proffered evidence adequate to raise a triable issue of fact on the essential element of Warden Hedgpeth's personal knowledge of the damaged door casing or, therefore, of any substantial risk to inmate safety it may have posed.

**3. <u>No Triable Issue Of Material Fact Re Warden Hedgpeth's Liability</u>**

---

[6] When Howard was asked to explain the basis for his characterization that the doorway presented a "hazardous condition," he replied: "A. I say 'hazardous' because, again, this is a Level 4 maximum security prison where weapons are made out of these things and fixtures. Q. Now, when you say 'hazardous,' you mean that someone could pry off this metal and create a weapon out of it, correct? A. Correct. Q. . . . It is the casing itself that's broken away from the freezer, correct? A. Correct. One portion. Q. But the casing itself is intact. It's still attached somewhere else on the freezer . . . . A. Right." (Dkt. No. 53-1, 31:13-32:10.)

A "plaintiff must allege facts, not simply conclusions, to show that an individual was personally involved in the deprivation of his civil rights." <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998) ("Liability under § 1983 must be based on the personal involvement of the defendant"). In his individual capacity, a supervisor "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." <u>Taylor</u>, 880 F.2d at 1045; <u>Monell</u>, 436 U.S. at 691. Howard alleges Warden Hedgpeth normally held weekly meetings with KVSP central kitchen staff supervisors and also performed walk-throughs of the area himself. (Dkt. No. 11-1, p. 4, ¶¶ 10-11.) During one of those walk-throughs, Howard alleges fellow inmate Eric Joseph purportedly brought the loose metal to the warden's attention, but despite that notice, he failed in his duty to provide a safe work environment when he took no corrective action. (Dkt. No. 11-1, p. 4, ¶¶ 10-11.)

Despite his representation that Mr. Joseph told Howard he had mentioned the door frame hazard to Warden Hedgpeth at some unspecified time on one of the Warden's kitchen walk-throughs (Dkt. No. 53-1, 27:21-28:1), Joseph's one-paragraph Declaration does not state he informed the Warden personally about the loose metal, nor does he even mention Warden Hedgpeth's name (Dkt. No. 65, p. 34). Rather, he states only that he raised the issue of detached framing on the freezers with "Kitchen Supervisors." (Dkt. No. 67, 3:7-18; Dkt. No. 65, p. 34.) That vagueness is insufficient to impute personal knowledge to the Warden. Howard's deposition testimony and evidentiary showing substantiate neither he nor any of his witnesses knows whether the door condition was ever actually discussed at a kitchen staff meeting or that Warden Hedgpeth was actually aware of the damaged casing. (Dkt. No. 53-1, 30:7-25.) He relies on no more than conclusory speculation to impute to the Warden actual knowledge of "the dangerous base and hanging metals in the freezer and around (KVSP) Central kitchen." (Dkt. No. 65, 5:17-6:11.) As Howard identifies no evidence from which a reasonable fact-finder could conclude Warden Hedgpeth had personal knowledge, the Warden is entitled to judgment in his favor as a matter of law.

### 4.  No Material Issue Of Fact Re Defendants' Deliberate Indifference

Howard alleges Defendants "acted with Deliberate Indifference to Plaintiff['s] personal safety" and "willfully, maliciously or with a reckless or callous disregard to Plaintiff's health and safety"

"subject[ed him] to an unsafe work environment." (Dkt. No. 65, 9:20-22; 9:26-10:5.) He characterizes their "acts and omissions" in requiring him to help with the pallet while knowing of the door frame damage as "sufficiently harmful to violate the evolving stand[ards] of decencies that marks a contemporary society," while "acting under color of state laws, in their official, personal and individual capacities." (Id., 9:26-10:5.) The Court assesses below Howard's hyperbole in characterizing the hazard posed by the loose portion of door frame in connection with its discussion of the objective element of an Eighth Amendment claim. To prevail on the subjective element of his Eighth Amendment claim, Howard must prove each individual defendant (1) was actually aware of facts from which an inference could be drawn that a substantial risk of harm existed, (2) actually drew the inference, and (3) nevertheless disregarded the risk to the inmate's health or safety. Farmer, 511 U.S. at 837. Defendants maintain Howard's injury was the result of an unforeseen and "freak" occurrence, "not because the condition of the metal was . . . demonstrably unsafe such that it would be seen and avoided."[7] (Dkt. No. 67, 4:15-19.)

There is no dispute "the Defendants had knowledge of the loose metal on the VEG. FREEZER prior to 10/29/07" as shown by Defendants' Undisputed Fact No. 15.[8] Defendant M. Howard, the KVSP Assistant Correctional Food Manager, confirms he "had placed Plant Operation Work Requests on June 29, 2006 and March 13, 2007 for repairs to the freezer trim and base cover in the KVSP Central Kitchen" (Dkt. No. 65., 69:19-23). Defendant Hankins, the Materials and Stores Supervisor on duty at the time of Howard's injury, in response to Interrogatories and Requests for Admissions, recalled Howard was "assisting Inmate Washington who was pulling a pallet full of vegetables in the Walk-In freezer." (Dkt. No. 65, 63:14-15.) Defendant Hankins was "aware that ACFM Howard placed a Plant Operation Work Request on March 13, 2007 for repairs to the freezer trim and base cover in the KVSP

---

[7] "The pallet of vegetables in question had to be moved in a straight line less than five feet to clear the freezer door. (U.F. No. 4.) Despite the several hundred pounds of weight, Inmate Washington's side of the pallet cleared the quarter inch thick base cover at the threshold of the freezer door without incident. (U.F. Nos. 5-8.) More importantly, Plaintiff admits that the casing/base cover sprung [sic] back instant[an]eously without any warning whatsoever as the wheels of the pallet jack cleared the threshold of the freezer door. (U.F. No. 10.)" (Dkt. No. 53, 109:28-10:4.)

[8] "15. Assistant Correctional Food Manager [M.] Howard had submitted a plant operation work request on March 13, 2007 to repair the area of the freezer casing/base cover that caused Plaintiff's injury." (Dkt. No. 53, 4:26-5:2; see Dkt. No. 62, 5:24: "Plaintiff Admits to (DUF) #15.")

1  Central Kitchen" (Id., 63:21-22), as well as on June 29, 2006. Defendant R. Sempel was assigned the
2  second watch/shift as the Central Kitchen Officer on October 29, 2007. (Id., 73:27-74:7.) Defendant
3  Sempel was also "aware that ACFM Howard placed Plant Operation Work Requests on June 29, 2006
4  and March 13, 2007 for repairs to the freezer trim and base cover" in the Central Kitchen. (Id., 75:24-
5  28.)

6  Defendant W. Kirby was assigned as the Central Kitchen Sergeant when he received word
7  Howard had been injured. (Dkt. No. 65, 79:27-80:7.) In response to an Interrogatory inquiring whose
8  duty it was to perform "daily security checks for loose metals/hazardous areas in the (KVSP) Central
9  Kitchen," he described the scope of correctional officers' security duties: "Correctional staff are
10 charged with the responsibility to perform regular security searches of the KVSP Central Kitchen for
11 contraband and weapons. . . ." (Id., 81:27-82:4.) He does not know whether "any individual is
12 specifically charged with the duty of ensuring the safety of metal fixtures around the KVSP Central
13 Kitchen," but is aware that ACFM Howard placed the two Plant Operation Work Requests for freezer
14 trim and base cover repairs. (Id., 81:6-9, 99:26-28.) Defendant Kirby attended staff and officers
15 meetings in the Central Kitchen twice a week between October 29, 2006 and October 29, 2007, but has
16 no specific recollection of loose or defective metals being discussed as a safety concern during that time.
17 (Id., 81:16-25.)

18 Howard proffers the Declarations of three inmates familiar with the conditions in the KVSP
19 central kitchen to support his Opposition. Eric Joseph, a KVSP inmate employed in the prison's main
20 kitchen since February 2007, declares he was reassigned to the kitchen store room in August 2007. (Dkt.
21 No. 65, p. 36.) On his first day there, Mr. Joseph declares he "noticed that the inside of the freezers &
22 refrigerators were partially torn from their original fixtures," a condition he represents creates a
23 hazardous work environment for kitchen workers. (Id.) Without specifying any dates or naming any
24 names, Mr. Joseph declares he "spoke with numerous (Kern Valley) kitchen supervisors" about that
25 safety concern, but his "pleas were ignored." (Id.)

26 Inmate Todd Fluette declares he began working in the KVSP central kitchen in June 2007 and
27 witnessed Howard's accident:

28 I've worked in the storage room and had knowledge of the defective door

> jam[b] in Freezer #1/vegetable freezer because my job description requires me to enter it daily. I was aware of the defect in the storage freezer so it is only o[b]vious that (Kern Valley) kitchen staff was aware of the same problem. My supervisor M. Hankins knew of the defective conditions of the door #1/freezer prior to inmate Howard being injured on the date of October 29th [20]07 at approximately 1:30 pm. I also witnessed inmate Howard get his left hand ripped open on one and the same defective door jam[b] I knew to watch out for while pushing a pallet jack in central kitchen.

(Dkt. No. 65, p. 34 (inmate number omitted).)

Howard also provides the declaration of Michael Washington, an inmate who had been employed in the KVSP central main kitchen since November 2006. He was helping maneuver the vegetable pallet when Howard was injured.

> I work in the scullery section of the kitchen but when finished in my area I help out other inmates in their job sections of the kitchen. On October, 29th, 2007 myself and inmate Howard were asked to help move fully loaded pallets of vegetables by staff of (Kern Valley) M. Hankins. As we begun, I was pulling while inmate Howard was pushing from the back when all of a sudden, I hear inmate Howard scream in pain very loudly ("I'm cut!"). I, inmate Washington, witnessed this whole ordeal. The defective door jam[b] ripped inmate Howard[']s left hand open on #1/vegetable freezer. . . .

(Dkt. No. 65, p. 35 (prisoner number omitted).)

Other exhibits reflect he filed an administrative appeal after his accident, seeking monetary damages and corrective action, contending "KVSP was negligent because his hand was cut on a damaged door way on the walk-in freezer." (Dkt. No. 65, p. 57.) The institution's response was to remove the "damaged sheet metal. . . from the doorway of the walk-in freezer to eliminate the risk of future injury." (Id.) The second level appeal response states: "The appellant notes he is satisfied with the freezer being fixed, but continues to request monetary compensation," relief unavailable through the administrative appeals process. (Id., p. 57; *see also* Id., p. 59 (Director's Level Appeal result).)

Howard argues: "Defendants had prior knowledge of the defect conditions [*sic*] of the VEG. FREEZER, yet still instructed Plaintiff to enter it . . . failing in their obligatory duty to protect Plaintiff." (Dkt. No. 64, 16:24-17:8.) However, "[n]ot every deviation from ideally safe conditions amounts to a constitutional violation." Hoptowit v. Spellman, 753 F.2d 779, 784 (9th Cir. 1985) (finding bad lighting conditions in occupational areas of the prison exacerbated the inherent dangerousness of already-existing, serious hazards and posed a serious threat to the safety and security of inmates).

Howard's own evidence substantiates the freezer was in daily use by multiple kitchen workers in that condition without incident for many months prior to his injury. (*See, e.g.*, Fluette Decl., Dkt. No. 65, p. 34: "my job description requires me to enter [the vegetable freezer] daily.") Even assuming a loose portion of the door casing posed a risk to kitchen workers, "prison officials who actually know of a substantial risk to inmate health or safety may be found free from liability if they respond reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844-45 ("whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause"). The evidence reflects each of the named correctional officers knew the damaged metal door casing had been reported twice for repairs before Howard's accident. "Not every injury that a prisoner sustains while in prison represents a constitutional violation."[9] Morgan, 465 F.3d at 1045. Negligently ignoring a safety hazard falls short of the "deliberate indifference" required to establish a constitutional violation, unless the defendant's conduct exacerbated an existing danger in some manner. *See, e.g.,* Hoptowit, 753 F.2d at 784; Osolinski v. Kane, 92 F.3d 934 (9th Cir. 1996).

With respect to the deprivation of a basic need element of an Eighth Amendment claim, Howard also fails to satisfy the "danger-plus" showing required to prevail.[10] A prisoner must demonstrate there existed not only a threat to inmate safety from the particular dangerous condition, but also some additional condition exacerbating that threat. Morgan, 465 F.3d at 1045;[11] *see* Osolinski, 92 F.3d at 938

---

[9] For example, as noted in Osolinski, 92 F.3d at 938 n.3, the Eighth Circuit affirmed the dismissal of an Eighth Amendment claim in Bibbs v. Armontrout, 943 F.2d 26 (8th Cir. 1991) "because it determined that the prison officials' conduct in ignoring the hazard was mere negligence" when a prisoner lost two fingers because a machine he was working with had had its safety guards removed. The Osolinski court distinguished the basis for the Bibbs holding, which turned "on the inmate's failure to show deliberate indifference, rather than to show deprivation of a basic need" the Osolinski court construed as the focus of the claim it was addressing.

[10] The Osolinski court also discussed Gill v. Mooney, 824 F.2d 192 (2d Cir. 1987), a case deciding whether the alleged deprivation was sufficiently serious to state an Eighth Amendment violation claim (*i.e.*, "whether, in light of clearly established principles at the time of the incident, the officials could have believed their conduct was lawful"). Osolinski, 92 F.3d at 937. In Gill, the Second Circuit held the inmate stated a claim for an Eighth Amendment violation where he alleged a prison official ordered him to continue working on a defective ladder while knowing the ladder was unsafe. "[T]he unsafe nature of the ladder posed an immediate threat to the inmate," and the order to remain on the ladder "exacerbated the inherent dangerousness of the defective ladder, rendering the ladder a serious safety hazard," in satisfaction of the objective prong of the Eighth Amendment analysis. Osolinski, 92 F.3d at 938-39.

[11] In Morgan, the court found an Eighth and Fourteenth Amendment violation where a prison supervisor

("No cases in this circuit clearly established that a single defective device, without any other conditions contributing to the threat to an inmates' safety, created an objectively insufficient humane condition violative of the Eighth Amendment"). Howard does not allege that the pallet itself was in any way defective. He does not represent he pointed out a substantial danger but was nevertheless ordered to continue working so that he was compelled to "perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] him undue pain" in its performance. *See* Berry, 39 F.3d at 1056-57; Morgan, 465 F.3d at 1045; *see also* Section II.C, below. He proffers no evidence from which a reasonable inference could be drawn that the type of springing motion that caused his injury was reasonably foreseeable, or that the condition of the door frame rendered the work environment unduly hazardous, or that any of the Defendants actually drew such an inference with the requisite deliberate indifference to inmate health or safety from that source so as to offend "the evolving stand[ards] of decencies that marks a contemporary society." (Dkt. No. 65, 9:26-10:5.) Accordingly, Defendants are entitled to judgment in their favor as a matter of law on Howard's Eighth Amendment claim.

### C. Qualified Immunity

Defendants also assert a qualified immunity defense. The qualified immunity doctrine "protects government officials who perform discretionary functions from civil liability, as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Morgan, 465 F.3d at 1044 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "When a public official asserts qualified immunity from liability, the district court must determine whether, in light of clearly established principles governing the conduct in question, the official objectively could have believed that his conduct was lawful." Osolinski, 92 F.3d at 936, *citing, inter alia,* Anderson v. Creighton, 483 U.S. 635, 641 (1987). The Court first inquires whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the second inquiry addresses whether the right was "clearly established such that a reasonable government official would

---

compelled the inmate to continue working with a dangerously defective printing press after the inmate reported the safety hazard -- loose chains on the press that caused it to buck and shake, nearly tearing off two of his fingers while he was operating it. Morgan, 465 F.3d at 1044. The supervisor ordered him to continue working and to "just be careful." (Id.) The prisoner subsequently had his right thumb torn off when the press caught his hand.

know that 'his conduct was unlawful in the situation he confronted[.]' " Morgan, 465 F.3d at 1044, *quoting* Saucier, 533 U.S. at 202.

In his Opposition, Howard correctly states: "The threshold question for qualified immunity is whether the facts establish that a Defendant['s] conduct violated a constitutional right." (Dkt. No. 64, 18:21-26, citing Saucier: "If no constitutional right was violated the inquiry ends and the defendant[] prevails.") However, he mistakenly represents: "The Honorable Court has said Plaintiff stated a claim therefore constitutional violation have [*sic*] occurred," purportedly satisfying the first Saucier inquiry. (Dkt. No. 64, 20:12-15.) He misconstrues the import of the Court's initial screening of his SAC. In that process, the Court merely determines from the face of the complaint whether a claim is stated, not whether a claim is proven. Summary judgment standards require a plaintiff to produce evidence on the merits of the material allegations adequate to raise a genuine issue for trial. Inasmuch as the Court has concluded Howard failed to raise a genuine issue for trial on required elements of his Eighth and Fourteenth Amendment violation claims, the qualified immunity inquiry can end at the first step.

Even were the Court to reach the second step of the qualified immunity analysis, Defendants argue "reasonable prison officials in their positions would not have believed that instructing Plaintiff to assist in pushing a pallet of vegetables through a walk[-]in freezer door with a loose casing/base cover at its threshold (*i.e.*, a single defective device) would violate clearly established law at the time the action occurred." (Dkt. No. 53, 14:7-10.) They argue Howard's claim is akin to cases like Osolinski, 92 F.3d 934, decided on the objective component of an Eighth Amendment claim. The Osolinski court expressly did not "address deliberate indifference," but rather "confine[d its] inquiry to the objective requirement of the Eighth Amendment" because the officials' "failure to repair the oven door put at issue [the prisoner's] need for personal safety." Osolinski, 92 F.3d at 937, 936. In that case, a prisoner "brought suit after he suffered second-degree burns on his arm when an oven door fell off its hinges in the Facility's family visiting unit." Id. at 935. Prior requests for maintenance on the oven door had been submitted three times in the nine months before the accident. None of the requested repairs had been undertaken before the prisoner was injured. Id. The prisoner "alleged a violation of the Eighth Amendment based on the prison officials' failure to fix the offending oven door despite the maintenance requests." Id. In holding the prison officials were entitled to qualified immunity, and therefore to

summary judgment in their favor, the court concluded: "in light of clearly established principles at the time of the incident a reasonable prison official could have believed that the failure to repair an oven as alleged did not violate the Eighth Amendment." <u>Id.</u>, at 939.

Similar to the result in <u>Osolinski</u>, this Court finds a reasonable prison official could have believed that the failure to repair a loose portion of a door casing did not violate the Eight Amendment. Therefore, the Court finds, in light of established principles at the time of the incident, Defendants are entitled to qualified immunity because reasonable prison officials could believe their conduct in continuing to deploy prison kitchen workers to move pallets of vegetables in and out of the walk-in freezer despite the presence of a damaged portion of threshold casing was lawful. *See* <u>Osolinski</u>, 92 F.3d at 937; <u>Saucier</u>, 533 U.S. at 202.

### III.     CONCLUSION AND ORDER

For all the foregoing reasons, **IT IS HEREBY ORDERED** Defendants' Motion For Summary Judgment in their favor is **GRANTED**, disposing of this action in its entirety.

**IT IS SO ORDERED.**

DATED:  February 3, 2011

_____
Hon. Roger T. Benitez
United States District Judge